UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

v.

DANIEL G. SASIADEK,

Defendant.

**DECISION AND ORDER**

1:15-CR-00159 EAW

## INTRODUCTION

Defendant Daniel G. Sasiadek ("Defendant") is charged in an eight-count Superseding Indictment ("Indictment"), returned on May 5, 2016, with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and seven counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). (Dkt. 19). Presently before the Court is the Report and Recommendation ("R&R") of Magistrate Judge Hugh B. Scott, recommending that this Court deny Defendant's motions to suppress evidence derived from the execution of a search warrant. (Dkt. 30 at 3 (Motion to Suppress); Dkt. 87 (Letter Motion); Dkt. 93 (R&R)). Defendant objects to the R&R. (Dkt. 101). For the reasons set forth below, the Court adopts the R&R in its entirety and denies Defendant's motions to suppress evidence.

## BACKGROUND

Magistrate Judge Scott observed that the facts leading to Defendant's arrest are undisputed. (Dkt. 93 at 2). Indeed, Defendant does not dispute the background and facts set forth by Magistrate Judge Scott in the R&R and assumes familiarity with them in his

objections. (*See* Dkt. 101 at 1 (assuming "familiarity with the case background and facts as they are set out in Judge Scott's R&R")). The Court incorporates the facts recounted in the R&R (Dkt. 93 at 1-8) and summarizes them below.

I. **The NIT Warrant**

Playpen was a secret website containing mostly child pornography, although some portion of the content would not meet the statutory criteria for child pornography. It operated as a "hidden service" on the "dark web" and was accessible only through a network known as The Onion Router or "Tor." (Dkt. 42 at 65-66). Playpen did not collect or store its visitors' Internet Protocol ("IP") addresses, thus providing anonymity to its users. (*Id.*). Moreover, Playpen encouraged users to mask their identities by using fake names and email addresses. (*See id.* at 69).

In February 2015, the FBI seized and took over Playpen, but because Playpen masks its users' IP addresses, FBI agents could not identify or locate Playpen users. (*Id.* at 31). To bypass the Playpen's anonymity, FBI agents deployed a tactic called a Network Investigative Technique ("NIT"). (*See id.*). The NIT is a software that installed itself surreptitiously once a Playpen user logged onto the website and reached the homepage. (*See id.* at 78-82). After installation, the NIT obtained the IP address and other identifying information for the computer accessing Playpen, and transmitted that information to the FBI. (*See id.*).

On February 20, 2015, the FBI applied for a warrant to deploy the NIT and investigate the users of Playpen from a magistrate judge in the Eastern District of Virginia. The 31-page warrant application described the place to be searched as the computer server

"operating the Tor network child pornography website . . . located at a government facility in the Eastern District of Virginia. The activating computers are those of any user or administrator who logs into [Playpen] by entering a username and password." (Dkt. 42 at 54). The warrant application identified information that FBI agents sought through use of the NIT, including any activating computer's IP address, a unique identifier generated by the NIT, and the type of operating system on the activating computer. (*Id.* at 55). The warrant application described Playpen as follows:

> [Playpen] is dedicated to the advertisement and distribution of child pornography, the discussion of matters pertinent to child sexual abuse, including methods and tactics offenders use to abuse children, as well as methods and tactics offenders use to avoid law enforcement detection while perpetrating online child sexual exploitation crimes such as those described [elsewhere] in this affidavit.

(*Id.* at 65). According to the warrant application, the "primary purpose" of Playpen is "the advertisement and distribution of child pornography." (*Id.* at 68). The warrant application stated that "the entirety of [Playpen] is dedicated to child pornography" (*id.* at 75) and noted that the homepage contained "two images depicting partially clothed prepubescent females with their legs spread apart" (*id.* at 87). The warrant application also described the NIT, stating that, under the NIT, Playpen would augment the content it normally sends to users who visit the website with "additional computer instructions" that, once downloaded, would "cause the user's 'activating' computer to transmit certain information to a computer controlled by or known to the government." (*Id.* at 79). The NIT would operate on activating computers "wherever located." (*Id.* at 84). The magistrate judge in the Eastern District of Virginia issued the search warrant. (*Id.* at 52-53).

## II. The Warrant for Defendant's Residence

In 2015, FBI agents identified an IP address that connected with Playpen. FBI agents confirmed that the IP address was Defendant's by contacting Time Warner Cable. Then, with Defendant's IP and residential addresses, FBI agents applied to Magistrate Judge Scott for a search warrant for Defendant's residence. (*Id.* at 8). Magistrate Judge Scott issued the search warrant on July 16, 2015. (*Id.* at 3; Dkt. 93 at 3 n.2 (explaining typographical error in date of warrant)). On July 17, 2015, FBI agents searched Defendant's residence and arrested him. (Dkt. 1). The instant prosecution followed.

## III. Proceedings Before Magistrate Judge Scott

This Court referred all pretrial matters in the case to Magistrate Judge Scott pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). Defendant filed pretrial motions before Magistrate Judge Scott, including motions to suppress evidence derived from the execution of the NIT warrant. (Dkt. 30 at 3; Dkt. 87; *see also* Dkt. 40; Dkt. 54; Dkt. 58; Dkt. 77; Dkt. 86). The Government opposed Defendant's suppression motions. (Dkt. 43; Dkt. 60; Dkt. 61; Dkt. 81; Dkt; Dkt. 82; Dkt. 83; Dkt. 88; Dkt. 89; Dkt. 91; Dkt. 92). The record before Magistrate Judge Scott included the warrant for Defendant's residence; the NIT search warrant and supporting affidavit; and evidence presented and decisions rendered in other cases in which defendants moved to suppress evidence resulting from the NIT warrant at issue here. (*E.g.*, Dkt. 42; Dkt. 45; Dkt. 50; Dkt. 58; Dkt. 91).

On November 2, 2017, Magistrate Judge Scott issued the R&R, which recommended that this Court deny Defendant's motions to suppress.[1] (Dkt. 93). In reaching that conclusion, Magistrate Judge Scott did not hold an evidentiary hearing and relied on the decisions of the First, Eighth, and Tenth Circuits, which all applied the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), and declined to suppress evidence derived from the NIT warrant. (Dkt. 93 at 8-13).

## IV. Proceedings Before This Court

After the Court granted Defendant two extensions of time (Dkt. 96; Dkt. 99), Defendant timely filed his objections to the R&R on February 22, 2018 (Dkt. 101). On March 2, 2018, the Government filed its response in opposition to Defendant's objections. (Dkt. 105). On March 16, 2018, Defendant filed a reply in further support of his objections. (Dkt. 106). Oral argument was held before the undersigned on March 20, 2018, at which time the Court reserved decision. (Dkt. 107).

## DISCUSSION

## I. Standard of Review

A district court reviews a report and recommendation to which a party has timely objected under a *de novo* standard. Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is

---

[1] On the same date, Magistrate Judge Scott also issued a Decision and Order adjudicating Defendant's non-dispositive pretrial motions. (Dkt. 94). Defendant has not appealed Magistrate Judge Scott's Decision and Order.

made."); *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997) (requiring a district court to make *de novo* determinations to the extent that a party makes specific objections to a magistrate judge's findings). The Court is not required to review *de novo* those portions of a report and recommendation to which objections were not filed. Fed. R. Crim. P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review."); *see Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009) (to trigger the *de novo* review standard, objections to a report "must be specific and clearly aimed at particular findings in the magistrate judge's proposal").

Upon *de novo* review and for the reasons set forth below, the Court adopts the R&R in its entirety and denies Defendant's motions to suppress.

## II. The *Leon* Good Faith Exception Applies

In the R&R, Magistrate Judge Scott granted, for the sake of argument, every substantive point that Defendant had raised in his motions to suppress: "that the NIT warrant violated Rule 41; that the violation rose to a level of constitutional magnitude; and even that the NIT warrant was void *ab initio*." (Dkt. 93 at 12). Magistrate Judge Scott concluded that, despite the forgoing deficiencies of the NIT warrant, the *Leon* good faith exception should apply. (*Id.* at 12-13). Defendant's objections to the R&R are confined to the issue of whether the *Leon* good faith exception applies, despite violations of the Fourth Amendment. (Dkt. 101 at 3-18).

"A violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010). "Indeed, exclusion 'has always been our last resort, not our first impulse.'" *Herring v. United States*,

555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Instead, whether the exclusionary rule applies "depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 140)). The "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n. 23)). In *Leon*, the Supreme Court identified four circumstances in which the good faith exception does not apply and the officer's reliance on the warrant will not be considered to have been in good faith:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923)).

Defendant contends that the officer could not have relied on the warrant because (1) the warrant misled the issuing magistrate; (2) the warrant lacked probable cause; and (3) the warrant was facially overbroad and insufficiently particularized. (*Id.*). The Court finds Defendant's arguments unpersuasive, as discussed below.

### A. The Weight of Authority Holds that the Good Faith Exception Applies to the NIT Warrant

The First, Third, Fourth, Eighth, and Tenth Circuits have each concluded that, even if the NIT warrant at issue in this case violates the Fourth Amendment, the *Leon* good faith

exception applies and suppression is not warranted. *United States v. Werdene*, 883 F.3d 204, 217 n.10 (3d Cir. 2018) (collecting cases). Magistrate Judge Scott adopted as persuasive authority the reasoning of the circuit courts that have addressed suppression in the context of Playpen and the NIT warrant and held that the good faith exception applies. (*Id.* at 12). Having reviewed the decisions that Magistrate Judge Scott adopted, as well as the decisions of circuit courts that have weighed in on the issue after Magistrate Judge Scott issued the R&R, the Court likewise relies on them and adopts them as persuasive authority.[2] *See Werdene*, 883 F.3d at 217; *United States v. McLamb*, 880 F.3d 685, 690 (4th Cir. 2018); *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017); *United States v. Horton*, 863 F.3d 1041, 1049 (8th Cir. 2017), *cert denied*, No. 17-6910, 2018 WL 1568107 (U.S. Apr. 2, 2018); *United States v. Workman*, 863 F.3d 1313, 1317 (10th Cir. 2017), *petition for cert. filed*, No. 17-7042 (U.S. Dec. 12, 2017). The analysis set forth in those decisions undermines each one of Defendant's arguments, as discussed below.

### B. The NIT Warrant Did Not Mislead the Magistrate Judge

Defendant argues that the NIT Warrant misled the issuing magistrate judge because it stated that "the entirety" of Playpen was devoted to child pornography, even though some of Playpen's content was not. (Dkt. 101 at 3-4). He also argues that the appearance of the Playpen homepage had changed by the time the FBI applied for the warrant and contained less sexually suggestive content. (*Id.* at 4). According to Defendant, these "misleading

---

[2] Although the Second Circuit has not yet weighed in on the issue, it is poised to do so in two appeals pending before that court. *See United States v. Eldred*, No. 17-3367 (2d Cir. filed Oct. 19, 2017); *United States v. Scanlon*, No. 17-2989 (2d Cir. filed Sept. 26, 2017).

statements" prevented the warrant application from establishing probable cause that users logging onto the site were likely committing a crime. (*Id.*). Defendant further argues that "the government was either convinced that its warrant application called for the Magistrate to issue a warrant beyond the scope of her authorization under Fed. R. Crim. P. 41"—which, at the time the EDVA warrant was issued, generally forbid a magistrate judge from authorizing a search outside her district—or "at a minimum harbored serious doubts about the authority of the issuing Magistrate to sign off on warrants permitting searches outside of her federal judicial district," based on Defendant's assertion that "the Department of Justice had long sought an amendment to Rule 41 that would permit searches like the one the FBI conducted in this case." (*Id.* at 4-7).

Defendant's argument that the FBI agent misled the magistrate judge about the content of Playpen is without merit. Although a small portion of Playpen was devoted to content that did not meet the statutory definition of child pornography, there is no serious dispute that the large majority of it did. And although the warrant application stated that "the entirety of [Playpen] is dedicated to child pornography" (Dkt. 42 at 75), it also represented that the "primary purpose" of Playpen is "the advertisement and distribution of child pornography" (*id.* at 68), a notion that Defendant does not—and cannot—dispute.

Defendant's argument that the government knew that the warrant was beyond the scope of the magistrate judge's authority under the version of Rule 41 in effect at that time is likewise unpersuasive and has been repeatedly rejected. For example, the Fourth Circuit in *McLamb* rejected the notion that consultation with DOJ attorneys should be deemed evidence of FBI agents' awareness that the warrant was invalid:

> The boundaries of a magistrate judge's jurisdiction in the context of remote access warrants were unclear at the time of the warrant application. Without judicial precedent for reference, the FBI consulted with attorneys from the Department of Justice Child Exploitation and Obscenity Section. Appellant casts the consultation in a cynical light, arguing that it evidences a guilty conscience. But in light of rapidly developing technology, there will not always be definitive precedent upon which law enforcement can rely when utilizing cutting edge investigative techniques. In such cases, consultation with government attorneys is precisely what *Leon*'s "good faith" expects of law enforcement. We are disinclined to conclude that a warrant is "facially deficient" where the legality of an investigative technique is unclear and law enforcement seeks advice from counsel before applying for the warrant.

*McLamb*, 880 F.3d at 691.

A district court in the Eastern District of New York similarly rejected Defendant's argument:

> [T]he question is not what the government collectively knew. The question is what the individual law enforcement officers that submitted the warrant in this case knew. Defendant seeks to attribute to the FBI agents that sought the warrant the legal expertise of the DOJ lawyers but nothing indicates that these agents knew that the warrant might violate Rule 41(b). It is somewhat hard to understand why they would have even submitted the warrant if they thought it exceeded the magistrate judge's jurisdiction. If they were so inclined to flout the Federal Rules of Criminal Procedure, they might have forgone seeking the warrant in the first place.

*United States v. Kim*, No. 16-CR-191 (PKC), 2017 WL 5256753, at *6 (E.D.N.Y. Nov. 10, 2017) (quoting *United States v. Eure*, CRIMINAL NO. 2:16cr43, 2016 WL 4059663, at *9 (E.D. Va. July 28, 2016)); *accord United States v. Allen*, No. 15-CR-620, 2017 WL 6397728, at *6 (E.D.N.Y. Dec. 14, 2017). This Court agrees. In raising this argument, Defendant "seeks to attribute to the FBI agents that sought the warrant the legal expertise of the DOJ lawyers, which is absurd." *United States v. Darby*, 190 F. Supp. 3d 520, 537

(E.D. Va. 2016). Accordingly, the Court rejects Defendant's argument that the NIT warrant misled the issuing magistrate judge.

### C. The NIT Warrant Did Not Lack Probable Cause

Next, Defendant argues that the NIT warrant lacked probable cause, which, according to Defendant, "depended on the contents of the site's home page and whether it was likely that anyone who saw it would know that what lay within was illegal." (Dkt. 101 at 13). He argues that "[t]he only pertinent information about the homepage presented to the EDVA Magistrate was a description of two pictures," which the FBI agent neither claimed were images that fit the definition of child pornography nor attached for the magistrate judge's review. (*Id.* at 13-14). He contends that the remainder of the affidavit was devoted to "general information about the TOR network" and "a recitation of some technical text on Playpen's homepage," and a description of Playpen's contents. (*Id.* at 14).

Defendant's challenge to probable cause is without merit. Although "it was possible that someone could log into Playpen and then not attempt to access child pornography, probable cause does not require certainty." *United States v. Allain*, 213 F. Supp. 3d 236, 244-45 (D. Mass. 2016). Moreover, the warrant application "established a fair probability that anyone who logged into Playpen would view or share child pornography." *Id.* The two images on the homepage, as described in the warrant application, depicted "partially clothed prepubescent females with their legs spread apart" (Dkt. 42 at 68), which would suggest the nefarious purpose of the website. Even setting aside the nature of those images, they were not the only factor supporting the probable cause determination. First, the

secretive nature of the site makes it likely that users knew it contained child pornography. As discussed above, Playpen was a hidden service on the Tor network and was difficult to find. According to the warrant application, "[a]ccessing [Playpen] . . . requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon [Playpen] without understanding its purpose and content." (*id.* at 67-68). "[T]he clandestine nature of the website and the challenges of finding it on the Tor Network suggest[] that those who logged into Playpen likely knew the purpose of the website and were entering it to access child pornography." *Allain*, 213 F. Supp. 3d at 245. Second, the warrant application made clear that the "primary purpose" of Playpen is "the advertisement and distribution of child pornography" and provided numerous examples of sub-forums of Playpen devoted to "the most egregious examples of child pornography." (Dkt. 42 at 68, 75-76). Based on the totality of the circumstances, the magistrate judge had a basis for concluding that probable cause supported the NIT warrant. *See, e.g., United States v. Stamper*, No. 1:15CR109, 2018 WL 1241575, at *8 (S.D. Ohio Mar. 9, 2018) (finding that there was probable cause to support the NIT warrant); *Kim*, 2017 WL 5256753, at *7 (same); *Allain*, 213 F. Supp. 3d at 245 (same); *United States v. Matish*, 193 F. Supp. 3d 585, 605-07 (E.D. Va. 2016) (same); *Darby*, 190 F. Supp. 3d at 534 (same).

### D. The NIT Warrant Was Not Facially Overbroad and Insufficiently Particularized

Defendant's final objection is that the NIT warrant was overbroad "because it allowed the FBI to search tens of thousands of computers for which particularized probable cause was not established," and lacked particularity "because it did not describe the place

to be searched," and "the express language of the EDVA warrant . . . authorized only searches of 'person or property located in the Eastern District of Virginia.'" (Dkt. 101 at 15-16). Neither argument is persuasive.

The Third Circuit recently rejected the argument that the NIT warrant failed to identify the place to be searched:

> [T]he NIT warrant adequately described the "Place to be Searched" as the "activating computers . . . of any user or administrator who logs into [Playpen] by entering a username and password," and it described the "Information to be Seized . . . from any 'activating' computer'" as seven discrete pieces of information. The warrant was therefore far from facially deficient because it specified which computers would be searched and what information would be retrieved.

*Werdene*, 883 F.3d at 217. Nor does the warrant suffer from a lack of particularity. As the Eighth Circuit described, the scope of the warrant was clear to a reasonable reader:

> The warrant . . . discusses at length the NIT and how it would be used to connect to computers "wherever located." Even if it were misleading to label the place to be searched as the Eastern District of Virginia, a reasonable reader would have understood that the search would extend beyond the boundaries of the district because of the thorough explanation provided in the attached affidavit.

*Horton*, 863 F.3d at 1052. Thus, the Court rejects Defendants' arguments that the NIT warrant was overbroad and lacked particularity.

E. **Applying the Exclusionary Rule Will Not Result in Deterrence**

Finally, as discussed above, whether the exclusionary rule applies "depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" *Rosa*, 626 F.3d at

64 (quoting *Herring*, 555 U.S. at 140)). In this case, applying the exclusionary rule will not deter future Fourth Amendment violations due to subsequent amendments to Rule 41:

> [E]ven though Rule 41(b) did not authorize the magistrate judge to issue the NIT warrant, future law enforcement officers may apply for and obtain such a warrant pursuant to Rule 41(b)(6), which went into effect in December 2016 to authorize NIT-like warrants. Accordingly, a similar Rule 41(b) violation is unlikely to recur and suppression here will have no deterrent effect. This is dispositive because when the deterrent value of suppression is diminished, the deterrence rationale loses much of its force and exclusion cannot pay its way.

*Werdene*, 883 F.3d at 218 (internal quotation marks omitted). This Court agrees and denies Defendant's suppression motions.

### III. An Evidentiary Hearing was Not Warranted

Defendant argues that Magistrate Judge Scott erred by not holding an evidentiary hearing regarding "material factual disputes" underlying the application of the exceptions to the *Leon* good faith doctrine. (Dkt. 101 at 3). However, the facts are not in dispute. Indeed, in his objections, Defendant assumes familiarity with Magistrate Judge Scott's factual recitation instead of reciting his own. (*See id.* at 1). Moreover, the issues in Defendant's case map fully onto the issues raised in numerous other cases that have considered the NIT warrant and Playpen suppression issues, thus obviating the need for an evidentiary hearing.

## CONCLUSION

For the reasons set forth above, the Court adopts the R&R (Dkt. 93) in its entirety and denies Defendant's motions to suppress evidence (Dkt. 30; Dkt. 87). A status conference to set a trial date is hereby scheduled before the undersigned on April 24, 2017, at 12:45 P.M.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: April 17, 2018
Buffalo, New York